## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ROBERTO ARROYO-GARCIA

CRIMINAL CASE NO.

1:12-CR-357-WBH-RGV

## ORDER FOR SERVICE OF MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Attached is the Report and Recommendation of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. Cr. R. 59(2)(a) and (b).  Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order.  Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court.  Failure to object to this Report and Recommendation waives a party's right to review.  Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18 U.S.C. § 3161(h)(1)(D) and (H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this 6th day of February, 2014.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL CASE NO. |
| | 1:12-CR-357-WBH-RGV |
| ROBERTO ARROYO-GARCIA | |

## MAGISTRATE JUDGE'S REPORT AND
## RECOMMENDATION ON DEFENDANT'S PRETRIAL MOTIONS

Defendant Roberto Arroyo-Garcia ("Arroyo-Garcia") is charged in a single-count indictment with illegal re-entry after deportation, in violation 8 U.S.C. § 1326(a) and (b)(2). See [Doc. 1].[1] Arroyo-Garcia has moved to suppress evidence and his statements, [Docs. 14 & 17],[2] and following an evidentiary hearing on

---

[1] The listed document and page numbers in citations to the record in this Report and Recommendation refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] Arroyo-Garcia filed his initial motion to suppress evidence on July 10, 2013, [Doc. 15], and he filed an amended motion to suppress evidence on July 25, 2013, [Doc. 17]. The government filed a response to the amended motion to suppress on August 21, 2013. [Doc. 19].

October 3, 2013,[3] the parties filed post-hearing briefs,[4] [Docs. 25, 31 & 32 ].  For the following reasons, it is **RECOMMENDED** that Arroyo-Garcia's motions to suppress evidence and statements, [Docs. 14, 15 & 17], be **GRANTED IN PART** and **DENIED IN PART**.

## I.  STATEMENT OF FACTS

On June 4, 2012, Special Agent Shawn Owens ("Agent Owens") and Special Agent Wendi Stewart ("Agent Stewart") of the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI"), were assisting in an investigation in Cobb County, Georgia.  (Tr. at 3-4, 15-16).  The investigation centered around a particular apartment where certain subjects were believed to be located.  (Tr. at 9).  The agents were positioned in separate cars near the apartment complex and were instructed to look for a vehicle matching a particular description.  (Tr. at 4, 8-9, 11-12, 16, 23-26).  Agent Owens saw the vehicle, a 2002 Toyota Camry, leave the apartment complex, and he began to follow it.  (Tr. at 4, 10; Ex. 1 at 2-3, 5).  From a few hundred yards away, Agent Owens saw the vehicle make a right turn

---

[3] See [Doc. 23] for the transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  In addition, the government submitted exhibits at the hearing, which will be referred to as "( Ex. ___)."

[4] The evidentiary hearing was limited to Arroyo-Garcia's motion to suppress statements, see [Doc. 20], so the parties did not file any post-hearing briefs regarding the motions to suppress evidence.

at an intersection from a left-hand lane, without using a turn signal. (Tr. at 4, 13-14; Ex. 1 at 3). Agent Owens reported over the radio to local police officers in the area that he had observed a traffic violation, and a Cobb County officer responded to the scene based on the information provided by Agent Owens. (Tr. at 4, 10, 12, 16; Ex. 1 at 3).[5] The Cobb County officer stopped the vehicle and arrested the driver, identified as Arroyo-Garcia, for driving without a license. (Tr. at 10; Ex. 1 at 2-4). In a search incident to arrest, the officer discovered a white plastic baggy in the front pocket of Arroyo-Garcia's shorts that contained what appeared to be cocaine. (Ex. 1 at 3; Ex. 2 at 3). Neither Agent Owens nor Agent Stewart had any contact with Arroyo-Garcia or any other individuals in the vehicle. (Tr. at 5, 17).

On June 29, 2012, HSI Special Agent James Ballard ("Agent Ballard") conducted an interview of Arroyo-Garcia at the Cobb County jail. (Tr. at 18, 35-36).[6] Agent Stewart was also present at the interview. (Tr. at 18, 28-29, 36). Agent Stewart was unfamiliar with working illegal reentry cases at the time because she was new to the unit, so Agent Ballard had been instructed by their supervisor to assist Agent Stewart with the interview and to show her how to process illegal reentry cases. (Tr.

---

[5] Agent Stewart, who was following behind Agent Owens, also saw the traffic violation and mentioned it over the radio, though she did not report the infraction to the local police. (Tr. at 17, 26).

[6] Agent Ballard was not involved in the investigation or arrest of Arroyo-Garcia on June 4, 2012, and he had no other involvement in the prosecution of Arroyo-Garcia following the June 29 interview. (Tr. at 42-43).

at 18-19, 29, 36, 43).[7]  Agent Ballard testified that, prior to the interview, it was "understood" that Arroyo-Garcia was present in the country illegally after a previous deportation, and that Arroyo-Garcia was going to be prosecuted for illegal reentry. (Tr. at 43-44). Agent Stewart had likewise been informed by her supervisor, Steven Ledgerwood, that Arroyo-Garcia had illegally reentered the country. (Tr. at 28-29).[8]  Neither Agent Stewart nor Agent Ballard had ever encountered Arroyo-Garcia before the June 29 interview, nor was Agent Stewart aware that Arroyo-Garcia had been stopped during the June 4 Cobb County investigation in which she had participated. (Tr. at 18, 33, 36).[9]

The interview was conducted through a transparent glass partition, with Agents Ballard and Stewart on one side and Arroyo-Garcia on the other. (Tr. at 39, 50). A desk was situated on either side of the glass, which also had a small opening that allowed for the passage of items from one side to the other. (Id. at 39, 50).

---

[7] Agent Ballard, on the other hand, was well-experienced with illegal reentry cases. (Tr. at 29).

[8] Agent Ballard testified that he did not recall whether he had Arroyo-Garcia's alien file before the interview, and Agent Stewart stated that she did not have the file until after June 29, 2012. (Tr. at 28-29, 42, 44-45). However, Agent Ballard also indicated that he and Agent Stewart did have information from Arroyo-Garcia's alien file prior to the interview. (Tr. at 42, 44-45).

[9] Agent Stewart also testified that she had not participated in any further investigation of Arroyo-Garcia between the June 4 investigation and the interview. (Tr. at 18, 28).

4

Agent Ballard conducted the interview in the Spanish language, in which he is fluent.  (Tr. at 19, 37-38); <u>see also</u> (Tr. at 45-48).  Agent Stewart, however, neither spoke to Arroyo-Garcia nor understood the interview because she does not speak Spanish.  (Tr. at 19, 31, 38).  Agent Ballard began the interview by identifying himself and explaining to Arroyo-Garcia that he wanted to talk to him about his immigration status.  (Tr. at 39, 56-57).  Agent Ballard then proceeded to ask Arroyo-Garcia a brief series of what he called "administrative" questions, designed to establish alienage.  (Tr. at 39, 56-57).[10]  Specifically, Agent Ballard asked Arroyo-Garcia what country he was born in, whether he was in the United States illegally, and whether he had any documentation from the U.S. government that would allow him to be in the country legally.  (Tr. at 56-57).[11]  Arroyo-Garcia responded that he was in the United States illegally.  (Tr. at 57).

Agent Ballard next instructed Arroyo-Garcia to "listen very closely" and to stop him and ask him to explain anything that he did not understand at any point in time during the interview.  (Tr. at 39); <u>see also</u> (Tr. at 19).  Agent Ballard then read

---

[10] Agent Ballard confirmed that it was his "typical pattern" to ask these administrative questions before administering <u>Miranda</u> warnings because he needed to first determine alienage and deportation history "before [he] can worry about prosecuting for reentry."  (Tr. at 57).

[11] Agent Ballard testified that he did not "recall his exact words" during the interview, but that his description of the interview was based on what he would "normally say in that situation" according to his common practice.  <u>See</u> (Tr. at 56).

5

Arroyo-Garcia his <u>Miranda</u>[12] rights verbatim from an official "Record of Sworn Statement" form issued by the U.S. Department of Immigration and Naturalization Service ("INS").  (Tr. at 40); <u>see also</u> (Ex. 3).  Arroyo-Garcia signed the waiver portion of the form, indicating that he had been advised of and understood his rights,[13] that he was willing to make a statement and answer questions, and that no promises or threats were made to him and no pressure or coercion was used against him.  (Ex. 3 at 2).  Agent Ballard then proceeded to ask Arroyo-Garcia a series of questions printed on the form, in response to which Arroyo-Garcia admitted that he had previously been deported from the United States and that he had reentered by foot about six months earlier without permission from the Attorney General.  (Tr. at 40-41; Ex. 3 at 3).  Agent Ballard wrote down each of Arroyo-Garcia's answers on the form as they were given.  (Tr. at 41).  When the interview was completed, Arroyo-Garcia signed the form a second time to aver that it represented a true and accurate record of his statement, and that his statement was also true and accurate. (Tr. at 39; Ex. 3 at 3).

---

[12] <u>See</u> <u>Miranda v. Arizona</u>, 38 U.S. 436 (1966).

[13] Specifically, Arroyo-Garcia was advised that: (1) "[a]nything you say can be used against you in court, or any Immigration or Administrative proceeding"; (2) "[y]ou have the right to talk to a lawyer for advise before we ask you any questions and to have him with you during questioning"; (3) "[i]f you cannot afford a lawyer, one will be appointed for you before any questioning if you wish"; and (4) "[i]f you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. . . ."  (Ex. 3 at 2).

Agents Ballard and Stewart both testified that at no point after Arroyo-Garcia was read his rights did he express that he did not understand anything, or that he did not wish to continue the interview any further.  (Tr. at 38, 40-42, 60).[14]  Agent Ballard further stated that at no time during the interview did Arroyo-Garcia indicate that he had an attorney or wished to obtain one, or that he did not want to speak with Agent Ballard.  (Tr. at 38, 59-60).

## II. DISCUSSION

Arroyo-Garcia moves to suppress evidence that was obtained as a result of the traffic stop and search subsequent to his arrest on June 4, 2012, which he contends violated the Fourth Amendment.  [Doc. 17 at 2-3].  In response, the government argues that even if the traffic stop was unlawful, any identity-related evidence obtained as a result of the stop and the arrest is nonetheless admissible under controlling Eleventh Circuit precedent.  See [Doc. 19].  Arroyo-Garcia also moves to suppress statements he made to Agent Ballard during the June 29, 2012, interview, arguing that the statements were tainted by the prior unlawful traffic stop and also were obtained in violation of Miranda.  See [Docs. 14 & 31].  The

---

[14] Agent Ballard also testified that Arroyo-Garcia did not have any trouble understanding him, and Agent Stewart affirmed that, while she did not understand what was said in Spanish during the interview, Arroyo-Garcia did not appear "puzzled" during the interview, nor did he make any expressions suggesting that he did not understand or that he wanted to stop the interview.  (Tr. at 19, 22, 38, 60).

government responds that Arroyo-Garcia's statements on June 29 are admissible because they were "free from any taint [caused] by the alleged unlawful stop[,]" [Doc. 25 at 8], and because Arroyo-Garcia waived his <u>Miranda</u> rights prior to any custodial interrogation, [<u>id.</u> at 9-12; Doc. 32 at 6-13].

### A.    Motion to Suppress Evidence

Arroyo-Garcia moves to suppress any evidence that was obtained as a result of the traffic stop on June 4, 2012, which resulted in his subsequent arrest and detention, including evidence of his "identity, fingerprints, immigration status and immigration history," as well as "evidence of the cocaine that was allegedly seized from his person."  [Doc. 17 at 2-3].  The government has stated that it does not intend to introduce evidence of the cocaine that was seized following the traffic stop "for purposes of proving [] violations under 8 U.S.C. § 1326(a) and (b)(2)."  [Doc. 19 at 3 n.1].  The government contends, however, that the "identity-related evidence" which Arroyo-Garcia seeks to suppress, such as fingerprints, immigration status, and immigration history, is "not suppressible" when offered only to prove Arroyo-Garcia's identity.  <u>See</u> [<u>id.</u> at 2].

The government does not contest that the June 4, 2012, traffic stop was unlawful.  <u>See</u> (Tr. at 8, 14); <u>see also</u> [Doc. 25 at 4].  Nevertheless, to the extent the government seeks to introduce evidence solely for identification purposes, the law

is clear in the Eleventh Circuit that "identity-related evidence is not suppressible when offered in a criminal prosecution only to prove who the defendant is," even when the evidence is obtained as a result of an unconstitutional search or seizure. See United States v. Vasquez–Garcia, 344 F. App'x 591, 592 (11th Cir. 2009) (per curiam) (unpublished) (citing United States v. Farias–Gonzalez, 556 F.3d 1181, 1182, 1189 (11th Cir. 2009), cert. denied, 558 U.S. 833 (2009)). See also Farias–Gonzalez, 556 F.3d at 1189 ("[T]he exclusionary rule does not apply to evidence to establish the defendant's identity in a criminal prosecution[.]"); United States v. Aguila–Perez, 344 F. App'x 521, 523 (11th Cir. 2009) (per curiam) (unpublished); United States v. Rosas-Illescas, 872 F. Supp. 2d 1320, 1324-26 (N.D. Ala. 2012); United States v. Diaz–Hernandez, No. 11–14014–CR, 2011 WL 1770455, at *7–8 (S.D. Fla. Apr. 15, 2011), adopted by 2011 WL 1765225, at *1 (S.D. Fla. May 9, 2011); United States v. Slaughter, No. 4:10–CR–24–01–HLM, 2011 WL 1337401, at *8–9 (N.D. Ga. Apr. 6, 2011).   Accordingly, it is **RECOMMENDED** that Arroyo-Garcia's motion to suppress evidence, [Doc. 17], be **GRANTED IN PART** and **DENIED IN PART**.[15]

## B.   Motion to Suppress Statements

Arroyo-Garcia argues that the statements he made during the June 29, 2012,

---

[15] Specifically, the motion is due to be granted with respect to the cocaine seized following the traffic stop, but to the extent Arroyo-Garcia's motion seeks to suppress identity-related evidence offered only to prove his identity, the motion is due to be denied.

interview should be suppressed as fruit of the poisonous tree because the statements were tainted by the preceding unlawful traffic stop.  Additionally, Arroyo-Garcia argues that his "incriminating admissions both before and after the rendering of <u>Miranda</u> warnings should be suppressed for failure to comply with the letter and spirit of <u>Miranda</u>[.]"  [Doc. 31 at 10].

      **1.**   *Fruit of the Poisonous Tree*

Arroyo-Garcia asserts that statements he made to Agent Ballard during the June 29 interview were "not attenuated from the illegal traffic stop" and that the fruit of the poisonous tree doctrine therefore requires their suppression.  <u>See</u> [Doc. 31 at 7]; <u>see also</u> [<u>id.</u> at 6-9].  The government concedes for purposes of the motion to suppress statements that the traffic stop which led to Arroyo-Garcia's arrest and detention was unlawful.  <u>See</u> (Tr. at 7-8); [Doc. 25 at 4].  However, the government argues that Arroyo-Garcia's statements are admissible nonetheless because they were "too attenuated from the stop to constitute fruit of the poisonous tree."  [Doc. 25 at 5]; <u>see also</u> [Doc. 32 at 1-6].

In determining if evidence is tainted by a prior constitutional violation, the Court inquires "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the

primary taint." United States v. Delancy, 502 F.3d 1297, 1309 (11th Cir. 2007) (citation omitted) (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)). "This is a fact-specific question, and no single fact is dispositive." Id. (citing Brown v. Illinois, 422 U.S. 590, 603 (1975)); see also United States v. Lopez-Garcia, 565 F.3d 1306, 1315 (11th Cir. 2009), cert denied, 558 U.S. 1092 (2009) (citation omitted). Rather, courts consider three non-exhaustive factors when evaluating whether a defendant's statements have been sufficiently purged from the taint of a prior unlawful search or seizure: (1) "the temporal proximity of the unlawful [stop and arrest] and the emergence of the incriminating evidence at issue"; (2) "the presence of intervening circumstances"; and, particularly, (3) "the purpose and flagrancy of the official misconduct." United States v. Figueroa- Cruz, 914 F. Supp. 2d 1250, 1266 (N.D. Ala. 2012) (citation and internal marks omitted) (quoting Hudson v. Michigan, 547 U.S. 586, 592 (2006)); see also Delancy, 502 F.3d at 1309 (citation omitted).

Applying these factors to the instant case, the Court finds that Arroyo-Garcia's statements to Agent Ballard were sufficiently removed from the stop and arrest to have purged any taint.  The first factor–temporal proximity–weighs decisively in favor of finding that Arroyo-Garcia's statements were untainted because a period of no less than 25 days separated the initial June 4 stop and the subsequent admissions made during the interview on June 29.  See Lopez-Garcia, 565 F.3d at

11

1318 (finding that temporal proximity was "exceedingly slight" where there were 10 days between the initial constitutional violation and subsequent confession); Devier v. Zant, 3 F.3d 1445, 1459 (11th Cir. 1993) (per curiam) (taint from detention completely attenuated by time of confession four days later); cf. United States v. Chanthasouxat, 342 F.3d 1271, 1280 (11th Cir. 2003) (three-minute gap between constitutional violation and admissions supported exclusion).

The intervening circumstances in this case also militate against a finding that Arroyo-Garcia's statements were tainted by the stop and arrest.  To begin with, Arroyo-Garcia's stop and arrest on June 4 and the subsequent questioning on June 29 were conducted by different individuals from different law enforcement departments and in different settings.  Specifically, Arroyo-Garcia was pulled over at a Cobb County intersection and arrested by local police, but the interview on June 29 was performed at the jail by HSI Agents Ballard and Stewart.  Moreover, neither Agent Stewart nor Agent Ballard had any contact with Arroyo-Garcia before the June 29 interview, (Tr. at 18, 33, 36), and the interview related to a "specific and circumscribed issue ([Arroyo-Garcia's] immigration status) completely distinct from the subject of the arrest ([driving without a license])," see Lopez-Garcia, 565 F.3d at 1316; see also (Tr. at 10; Ex. 1 at 2-4).  Furthermore, to the extent Arroyo-Garcia seeks to suppress his post-Miranda statements, Arroyo-Garcia's "review and signing of

12

the [waiver] form, which served as a notification . . . of [his] constitutional rights"
is a "highly significant" intervening circumstance which, "while not dispositive,
supports the government's argument that the causal connection between the entry
and the consent had 'become so attenuated as to dissipate the taint.'" See DeLancy,
502 F.3d at 1311-12, 1313-14 (quoting Wong Sun, 371 U.S. at 487).

Finally, the purpose and flagrancy factors also yield the conclusion that the
June 29 statements were untainted by the stop and arrest.  Although the government
has not contested the contention that Arroyo-Garcia was unlawfully stopped and
arrested, "[n]othing in the record suggests that the stop of [Arroyo-Garcia's] vehicle
and then his arrest, were motivated by an ulterior purpose to determine [Arroyo-
Garcia's] immigration status or to prosecute him for being in the country illegally."
Lopez-Garcia, 565 F.3d at 1316.  Nor is there any suggestion of flagrant police
misconduct associated with Arroyo-Garcia's subsequent detention and interview,
and Arroyo-Garcia does not allege that he was coerced, tricked, or intimidated in
any way, nor does the record support such a finding.

Neither Arroyo-Garcia's assertion that he was "targeted" in the June 4
investigation nor his vague suggestion that the investigation was connected in some
unspecified manner to his eventual prosecution for illegal reentry, see [Doc. 31 at 8],
finds any support in the record.  To the contrary, neither the reason for Arroyo-

Garcia's initial stop–the traffic violation reported to local police by Agent Owens–nor the basis for his arrest–driving without a license–bears any discernible connection to the subsequent prosecution and investigation for illegal reentry.  See (Tr. at 4, 10, 12, 16; Ex. 1 at 3).  Indeed, during the initial investigation, Agents Owens and Stewart were simply instructed to look for a particular vehicle, and Agent Stewart was not even aware until the interview that the investigation had resulted in Arroyo-Garcia's stop and arrest. (Tr. at 18, 28, 33, 36).  Nor did Agent Stewart conduct any subsequent investigation pertaining to Arroyo-Garcia between the time of his arrest and the interview.  (Id.).  Agent Ballard was likewise uninvolved in any investigation of Arroyo-Garcia prior to the June 29 interview. (Tr. at 42-43).  Therefore, even though it is uncontested "that the underlying [stop and] arrest violated [Arroyo-Garcia's] Fourth Amendment rights, there is no basis for concluding that the violation tainted the statements he made to [Agent Ballard] regarding his immigration status," see Lopez-Garcia, 565 F.3d at 1316, and Arroyo-Garcia's statements are thus not due to be suppressed as fruit of the poisonous tree.

**2.   _Pre-Miranda_ Statements**

Arroyo-Garcia contends that the statements he made to Agent Ballard during the initial questioning were obtained in violation of Miranda because Agent Ballard "elicit[ed] from [him] that he was in the country illegally without documentation

14

before giving him <u>Miranda</u> warnings." <u>See</u> [Doc. 31 at 14]. The government represents that it will not introduce any of Arroyo-Garcia's pre-<u>Miranda</u> statements, [Doc. 25 at 11; Doc. 32 at 8], but it also argues that the statements are admissible because the questions posed by Agent Ballard before the rendering of <u>Miranda</u> warnings were routine, administrative questions that did not constitute interrogation.

The ruling in <u>Miranda</u> requires law enforcement officers to apprise a defendant in custody of his Fifth Amendment rights before engaging in interrogation. <u>See</u> <u>Garcia v. Singletary</u>, 13 F.3d 1487 (11th Cir. 1994). "A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" <u>United States v. Brown</u>, 441 F.3d 1330, 1347 (11th Cir. 2006) (citation omitted) (<u>quoting</u> <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)). Interrogation for <u>Miranda</u> purposes "means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" <u>United States v. Gomez</u>, 927 F.2d 1530, 1538 (11th Cir. 1991) (alteration in original) (<u>quoting</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980)).

Arroyo-Garcia clearly was in custody at the time of the interview, but the government disputes that Agent Ballard's pre-<u>Miranda</u> questioning of Arroyo-

Garcia constituted interrogation that was reasonably likely to elicit an incriminating response. The government argues that Agent Ballard "did not ask [Arroyo-Garcia] the pre-*Miranda* administrative questions to induce an incriminating answer[,]" but was simply confirming Arroyo-Garcia's identity and booking information. [Doc. 25 at 11; Doc. 32 at 6-8]. Although Agent Ballard's intent is relevant, it is not dispositive, see Innis, 446 U.S. at 301 & n. 7, because the pertinent inquiry is whether his questions were reasonably likely to elicit an incriminating response, and based on the evidence before the Court, the pre-Miranda questions of whether Arroyo-Garcia was in the country illegally and whether he had any documentation that would allow him to be in the country legally, (Tr. at 56-57), "related directly to an element of the crime which [Agent Ballard] had reason to suspect that [Arroyo-Garcia] had committed." United States v. Salgado, 292 F.3d 1169, 1173 (9th Cir. 2002) (citing United States v. Mata-Abundiz, 717 F.2d 1277, 1279 (9th Cir. 1983)). See also United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1046 (9th Cir. 1990) (quoting Mata–Abundiz, 717 F.2d at 1280) ("'[T]he relationship of the question asked to the crime suspected is highly relevant.'").

Agent Ballard testified that he was privy to information from Arroyo-Garcia's alien file before the interview, (Tr. at 42, 44-45), and Agent Stewart had also been informed by her supervisor prior to the interview that Arroyo-Garcia "was an illegal

reentry," (Tr. at 28-29). Even more importantly, Agent Ballard testified that it was "understood" not only that Arroyo-Garcia was in the country unlawfully after a prior deportation, but also that he was going to be prosecuted for illegal reentry. (Tr. at 43-44). Indeed, Agent Ballard testified that he was assigned to conduct the interview of Arroyo-Garcia to "assist[] [Agent Stewart] with how to interview and properly investigate an illegal reentry prosecution." (Tr. at 36); see also (Tr. at 18-19, 29, 43). And the questions posed by Agent Ballard before the rendering of Miranda warnings–whether Arroyo-Garcia was in the country illegally and whether he had any documentation that would allow him to be here legally, (Tr. at 56-57)–were reasonably likely to substantiate the contemplated charge for illegal reentry.

The government argues that it was necessary for Agent Ballard to ask Arroyo-Garcia these initial administrative questions before he could proceed with the criminal interrogation requiring Miranda warnings. [Doc. 25 at 9-10 (citing Tr. at 57)]; see also [Doc. 32 at 7]. However, as Arroyo-Garcia points out, [Doc. 31 at 13-14], Agent Ballard's questions about whether he was in the country illegally and whether he had any documentation allowing him to be here legally went beyond merely determining alienage, and predictably elicited incriminating responses based on the facts known to the agents at the outset of the interview. Cf. United States v. Estrada-Monzon, Criminal Action File No. 4:10–CR–53–RLV–WEJ, 2011 WL 2118955,

17

at *4 (N.D. Ga. Apr. 25, 2011), adopted by 2011 WL 2073158, at *1 (N.D. Ga. May 24, 2011) (emphasis added) (finding interview in compliance with <u>Miranda</u> where officer elicited unwarned statements about defendant's citizenship, but then administered <u>Miranda</u> warnings "*before* proceeding with questioning intended to discover whether defendant was in this country legally"). The government is correct that "[i]f an [HSI] investigator has no reason to suspect that the question asked is likely to elicit an incriminating response, there is no interrogation and, therefore, no *Miranda* violation." <u>Mata-Abundiz</u>, 717 F.2d at 1279. However, "[i]n-custody questioning by [HSI] investigators is equivalent to an interrogation and must be preceded by Miranda warnings if the questioning is reasonably likely to elicit an incriminating response." <u>United States v. Guerrero-Acosta</u>, 152 F.3d 930 (9th Cir. 1998) (unpublished) (<u>citing Mata-Abundiz</u>, 717 F.2d at 1280).

Under the particular facts and circumstances of this case, the Court finds that the questions posed by Agent Ballard asking whether Arroyo-Garcia was illegally in the country and whether he had any documentation allowing him to be in the country legally prior to the rendering of <u>Miranda</u> warnings were reasonably likely to elicit incriminating responses from Arroyo-Garcia. <u>See</u> <u>United States v. Equihua–Juarez</u>, 851 F.2d 1222, 1226 (9th Cir. 1988), <u>abrogated on other grounds</u> by <u>Brogan v. United States</u>, 522 U.S. 398 (1998) (footnote omitted) (agent's inquiry into

18

biographical matters constituted interrogation where "directed at eliciting information which could be used in a criminal investigation and potential prosecution of [defendant] on charges of [] illegal entry"); Guerrero-Acosta, 152 F.3d at 930 (holding that "[t]he in-custody questioning of [defendant] regarding his manner, place and time of entry into the United States, prior deportations, alienage and permission to re-enter the country was likely to elicit incriminating responses"). Cf. Lopez-Garcia, 565 F.3d at 1306 (Miranda warnings not required where interviewing officer had "no reason to believe that [defendant] had been deported" or that "that he had reentered the country illegally," and had no "basis for believing that [defendant] would be prosecuted" for illegal reentry).  Because Arroyo-Garcia was subjected to custodial interrogation before he was advised of his Miranda rights, it is **RECOMMENDED** that Arroyo-Garcia's motion to suppress his pre-Miranda statements be **GRANTED**.

### 3. *Post-Miranda Statements*

In light of the determination that Arroyo-Garcia's pre-Miranda statements are subject to suppression, the Court now must consider whether the previous failure to warn has any bearing on the admissibility of the statements Arroyo-Garcia made after his subsequent written waiver of Miranda rights.  Arroyo-Garcia asserts that "the failure to give warnings prior to eliciting from [him] that [he] was in the

19

country illegally without documentation taints the statements made after the rendition of <u>Miranda</u> warnings." [Doc. 31 at 14]. Specifically, Arroyo-Garcia argues that by the time Agent Ballard issued <u>Miranda</u> warnings, a "reasonable person in [Arroyo-Garcia's] position would have felt that the proverbial cat was already out of the bag by virtue of his earlier[, unwarned] statements," and that the <u>Miranda</u> warnings were therefore rendered "meaningless" and "ineffective towards serving their purpose by the preceding un-<u>Mirandized</u> questioning[.]" [<u>Id.</u> at 14-15]. In response, the government contends that Arroyo-Garcia's post-<u>Miranda</u> statements are admissible because the statements were voluntarily made after a valid <u>Miranda</u> waiver, and because there is no evidence that the manner in which Agent Ballard conducted the interview was "deceptively designed to encourage [Arroyo-Garcia] to waive [his] <u>Miranda</u> rights[.]" [Doc. 25 at 11-12; Doc. 32 at 8-13].

In <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985), the Supreme Court held that "even where a suspect, while in custody, has answered unwarned questions from police, the suspect still may validly waive his *Miranda* rights and provide admissible statements after *Miranda* warnings." <u>United States v. Gonzalez-Lauzan</u>, 437 F.3d 1128, 1133 (11th Cir. 2006) (<u>citing</u> <u>Elstad</u>, 470 U.S. at 314). The Supreme Court explained that "[i]t is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other

20

circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." Elstad, 470 U.S. at 309. Consequently, even where Miranda requires suppression of a voluntary but unwarned admission, "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." Id.

In Missouri v. Seibert, 542 U.S. 600 (2004), the Court refined its ruling in Elstad by holding that even voluntary post-Miranda statements are nonetheless inadmissible where "a two-step interrogation technique [is] used in a calculated way to undermine the *Miranda* warning." Id. at 622 (Kennedy, J., concurring).[16] The Eleventh Circuit has held that "the *Seibert* exception . . . is aimed at putting a stop to the deliberate use of a particular police tactic employed for the specific purpose of undermining the *Miranda* rule." Street, 472 F.3d at 1313 (citing Seibert, 542 U.S. at 618 (Kennedy, J., concurring)). Thus, absent the deliberate withholding of warnings designed to circumvent Miranda, the "admissibility of postwarning statements should continue to be governed by the principles of *Elstad*[.]" Seibert, 542 U.S. at 622

---

[16] "Because Seibert is a plurality decision and Justice Kennedy concurred in the result on the narrowest grounds, it is his concurring opinion that provides the controlling law." United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006) (citing Romano v. Oklahoma, 512 U.S. 1, 9 (1994); Marks v. United States, 430 U.S. 188, 193 (1977); Gonzalez-Lauzan, 437 F.3d at 1136 n.6).

Kennedy, J., concurring).  See also Street, 472 F.3d at 1313-14; United States v. Naranjo, 426 F.3d 221, 232 (3d Cir. 2005).  And under Elstad, "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."  470 U.S. at 314.

Nothing in the record indicates that Agent Ballard deliberately withheld Miranda warnings as part of a concerted strategy to circumvent Miranda.  Rather, Agent Ballard testified that the pre-Miranda questions were intended to establish alienage and deportation history for administrative purposes.  See (Tr. at 39, 56-57).  Agent Ballard also confirmed that it was his "typical pattern" to ask these questions at the outset of an interview to help guide his decision of whether to commence a criminal investigation and which of several forms he should utilize to process the case.  (Tr. at 39, 54, 56-57).  As the government points out, see [Doc. 25 at 9-11; Doc. 32 at 6-8], HSI agents such as Agent Ballard serve dual functions as both criminal and civil investigators, and the Court finds nothing implausible in Agent Ballard's explanation that he would routinely ask a few basic, preliminary questions relating to immigration status to facilitate his determination of whether to proceed with the substance of the interview along criminal or civil lines.  As discussed above, Agent Ballard's explanation for withholding Miranda warnings, see (Tr. at 39, 56-57), does

not support his failure to warn under the particular circumstances of this case, where he had ample reason to know that his questions might elicit an incriminating response that could be used against Arroyo-Garcia in his contemplated prosecution. But the explanation does suggest that the failure to warn was based on Agent Ballard's customary adherence to a routine administrative protocol, rather than "part of a larger, nefarious plot" designed to undermine the efficacy of mid-stream Miranda warnings.  See United States v. Hernandez-Hernandez, 384 F.3d 562, 566 (8th Cir. 2004) (quoting Reinert v. Larkins, 379 F.3d 76, 91 (3d Cir. 2004)).  Indeed, in routine cases where the suspect's immigration history is unknown prior to the interview, the answers provided to the preliminary questions may direct the scope of any subsequent questioning solely to matters of civil deportation, thereby rendering Miranda warnings unnecessary.

Moreover, there is no indication that Agent Ballard confronted Arroyo-Garcia with his prior unwarned statements in an effort to have them repeated, or otherwise relied on the prewarning admissions in any way while obtaining the postwarning statement.  See Street, 472 F.3d at 1314 (agent's questioning was not an attempt to circumvent Miranda where he "did not withhold Miranda warnings, solicit a full confession, and then lead [defendant] back through his confession again"); cf. Seibert, 542 U.S. at 621 (Kennedy, J., concurring) (deliberate two-step technique

found where "postwarning interview resembled a cross-examination[,]" and where interviewing officer "pushed [defendant] to acknowledge [prewarning statements]").   Further, Arroyo-Garcia does not allege that his pre-<u>Miranda</u> statements were actually involuntary under the Fifth Amendment, nor does the record contain even the slightest hint that those statements were obtained as a result of coercion.

The Court thus finds that, despite having been obtained in technical violation of <u>Miranda</u>, Arroyo-Garcia's pre-<u>Miranda</u> statements were voluntarily made. Accordingly, the admissibility of Arroyo-Garcia's post-<u>Miranda</u> statements is governed by <u>Elstad</u>, <u>see</u> <u>Street</u>, 472 F.3d at 1314 (holding that <u>Elstad</u> applied because the interviewing agent did not use interrogation techniques designed to undermine <u>Miranda</u>); <u>United States v. Hernandez</u>, 200 F. App'x 283, 287 ( 5th Cir. 2006) (per curiam) (unpublished) (holding that <u>Elstad</u> applied where there was "no evidence . . . that the [] officers were pursuing any kind of deliberate strategy that would require suppression . . . under *Seibert*), under which "the relevant inquiry is whether, in fact, the second statement was also voluntarily made." <u>Elstad</u>, 470 U.S. at 318. <u>See also</u> <u>Guerrero-Acosta</u>, 152 F.3d at 930 (district court properly admitted defendant's post-<u>Miranda</u> statements after prior failure to warn where there was "no evidence [that defendant] was coerced to make either statement").

24

In assessing whether a confession was voluntary, the Court must determine whether the defendant "'made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him.'" Martin v. Wainwright, 770 F.2d 918, 924 (11th Cir. 1985) modified on other grounds on denial of reh'g, 781 F.2d 185 (11th Cir. 1986) (footnote omitted) (quoting Jurek v. Estelle, 623 F.2d 929, 937 (5th Cir. 1980) (en banc), cert. denied, 450 U.S. 1001, 1014 (1981))[17].  Here, there is no indication that Arroyo-Garcia's post-Miranda statements were involuntary.   Agent Ballard conducted the interview through a thick, transparent glass partition, (Tr. at 39, 50), and Arroyo-Garcia signed the waiver of rights form indicating that  no promises or threats were made to him and no pressure or coercion was used against him, (Ex. 2 at 2).  Agents Ballard and Stewart testified that at no point during the interview did Arroyo-Garcia express that he did not wish to continue answering questions or that he did not want to speak with Agent Ballard.   (Tr. at 19, 22, 38, 59-60).  Additionally, Arroyo-Garcia's decision to continue speaking with Agent Ballard after he  signed a written waiver of his Miranda rights is "highly probative" of the voluntariness of his post-Miranda statements.  See Elstad, 470 U.S. at 318.  Given

---

[17] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit.  Bonner v. City of Prichard, Ala. , 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

these circumstances, the Court concludes that Arroyo-Garcia's post-<u>Miranda</u> statements were voluntary.

Finally, in order to establish the admissibility of Arroyo-Garcia's post-<u>Miranda</u> statements, the government must show by a preponderance of the evidence that Arroyo-Garcia validly waived his <u>Miranda</u> rights.  <u>United States v. Chirinos</u>, 112 F.3d 1089, 1102 (11th Cir. 1997). <u>See also Colorado v. Connelly</u>, 479 U.S. 157, 168-69 (1986).  In <u>Miranda</u>, the Supreme Court established certain procedures which law enforcement must follow to protect against the "compelling pressures" inherent in custodial interrogation.  384 U.S. at 467.  Specifically, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires."  <u>Id.</u> at 468-70.  <u>Miranda</u> further requires that law enforcement respect the suspect's decision to exercise his rights as outlined in the warnings.  "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."  <u>Id.</u> at 473-74 (footnote omitted).  "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  <u>Id.</u> at 474.

A defendant may waive his rights if the waiver is made knowingly, intelligently, and voluntarily.  <u>Id.</u> at 444.  This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *3 (N.D. Ga. Aug. 10, 2007), adopted at *1 (citation omitted) (quoting United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)).  See also Moran v. Burbine, 475 U.S. 412, 421 (1986); Edwards v. Arizona, 451 U.S. 477, 482 (1981); Fare v. Michael C., 442 U.S. 707, 725 (1979).  "No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances." Patterson, 2007 WL 2331080, at *3 (citation omitted).  However, an express oral or written waiver of Miranda is strong proof of the validity of the waiver.  United States v. Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002).  To find a waiver involuntary, coercion by law enforcement is a "necessary predicate," Connelly, 479 U.S. at 167, and "in the absence of [such] coercion a court cannot conclude a defendant's waiver or inculpatory statements are involuntary," United States v. Minard, 208 F. App'x 657, 660 (10th Cir. 2006) (unpublished).

27

In this case, Agent Ballard conducted the interview in Spanish and confirmed that Arroyo-Garcia had no trouble understanding him throughout the interview. (Tr. at 19, 37-39).  Prior to rendering <u>Miranda</u> warnings, Agent Ballard cautioned Arroyo-Garcia to "listen very closely" and instructed him to ask for an explanation if at any time he did not understand something during the interview.  (Tr. at 39); <u>see also</u> (Tr. at 19).  Agent Ballard then read Arroyo-Garcia his <u>Miranda</u> rights from the INS Record of Sworn Statement form, (Tr. at 40; Ex. 3), and Arroyo-Garcia signed the waiver portion of the form, indicating that he understood his rights,[18] that he was willing to make a statement, and that his statement was not influenced by any promises, threats, pressure, or coercion, (Ex. 3 at 3).  When the interview was completed, Arroyo-Garcia signed the form a second time to verify the truth and accuracy of his statement as recorded.  (Tr. at 39; Ex. 3 at 3).  When Agent Ballard advised Arroyo-Garcia of his <u>Miranda</u> rights, Arroyo-Garcia did not ask for clarification, stop the interview, request counsel or indicate that he already had an attorney, or otherwise indicate in any way that he did not understand his rights or the consequences of his waiver.  (Tr. at 19, 22, 38, 40-42, 59-60).  Also, as noted

---

[18] As noted earlier, by signing the waiver Arroyo-Garcia expressed his understanding that anything he said could be used against him in court or in any immigration or administrative proceeding; that he had the right to an attorney and that an attorney would be appointed for him if he could not afford one; and that if he should choose to speak without counsel, he could still stop the interview at any time.  <u>See</u> (Ex. 3 at 2).

earlier, there is no indication in the record of any coercion used in connection with the waiver or interview.  The government has thus shown that, under the totality of the circumstances, Arroyo-Garcia was aware of the nature of his rights being abandoned and the consequences of his decision to abandon them and that he knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights.  Accordingly, it is **RECOMMENDED** that Arroyo-Garcia's motion to suppress his post-<u>Miranda</u> statements be **DENIED**.

## IV.  CONCLUSION

For the foregoing reasons, it is hereby **RECOMMENDED** that Arroyo-Garcia's motions to suppress evidence and statements, [Docs. 14, 15 & 17], be **GRANTED IN PART** and **DENIED IN PART**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 6th day of February, 2014.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

29